# MINTZ LEVIN

Chrysler Center
666 Third Avenue
New York, NY  10017
212-935-3000
212-983-3115 fax
www.mintz.com

**Peter A. Chavkin** | 212 692 6231 | pchavkin@mintz.com

March 27, 2014

Honorable Jesse Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York

Re:     *Sentencing of Noah Siegel, 13 Cr. 268 (JMF)*

Dear Judge Furman:

We represent Noah Siegel and write in connection with his sentencing on April 10.  Noah pled guilty to a single charge: a violation of 18 U.S.C. 1084, a felony with a two year maximum.

## INTRODUCTION

Noah was raised in New York City by his mother, who was a therapist (she is now an ESL teacher at La Guardia Community College) and his father, an esteemed college Classics professor.  Noah's father was Noah's mentor and role model – the single greatest influence in his life.  Noah lost him to cancer several years ago, when Noah was 25.

When Noah was a young child, his father taught him how to play chess.  It gave them an extraordinary number of shared, meaningful experiences.  Noah grew to be ranked the number one chess player in the United States for his age group.

Noah did well in high school and attended Connecticut College.  He left only a year shy of graduation.   When he left, Noah had drifted into sports betting, placing bets on websites against online bookmakers.  He enjoyed the analytical challenges it presented.  He was skilled at studying patterns and statistics and predicting which teams would win, building on the skills he had honed during his years studying chess.

After college, Noah continued making predictions on games and was eventually introduced to Helly Nahmad and Illya Trincher, who offered Noah a percentage of the profits from their winning bets against bookmakers and from the bets they ultimately made against other bettors.  Noah advised them on the wisdom of particular bets.

In the few months before the indictment in this case, the group began accepting bets from a handful of wealthy individuals.  In those bets, the other individuals were able to choose which side to bet on, typically at the same odds published by well-known bookmaking sites.  Noah most often learned of these bets after they were made and received a minimal percentage of their profits (roughly 3-5%).  His involvement in this activity was limited, as the Probation Report has

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 2

confirmed.  Noah did not find the other individuals who were making the bets.  In addition, his skill set in picking teams was less relevant – the other bettor got to choose which team to bet on.

Since his arrest, Noah has not gambled on sports, even at legal sites.  He has been volunteering weekly to tutor children in two different community programs, one run by the 14 Street Y and the other by Empire Children.  He has continued to develop a non-profit to implement a health-based program in city classrooms that will synthesize fitness of mind and body.  In addition, he met with the government voluntarily to provide information and answer any questions it might have and remains eager to meet with the government again should it want to.  And throughout this past year, he has remained the compassionate person from whom his friends, his family and perfect strangers have benefited over the past two decades.

We hope that Your Honor will consider a sentence that does not include incarceration because of the following:

- *First,* Noah's involvement in and knowledge of the group's bookmaking activity has been confirmed to have been limited.  Moreover, to the extent the Court considers it important, Noah mistakenly but genuinely believed at the time of his misconduct that the conduct did not cross the line (although he now recognizes that it did and he is the first to admit that he should have done something to definitively determine this at the time).

- *Second*, Noah was not indicted for, nor does the government allege, that he participated in any art fraud, extortion, illicit poker games, or tax crimes, all offenses hanging over other defendants in this case.

- *Third*, the nature of Noah's role in the offense, particularly as reflected in the plea and forfeiture he was offered, suggests that he is within or below the strata of betting group defendants who have been sentenced to probation (Zuriff, Smith and Aaron).  All three of those other defendants pled guilty to statutes with significantly higher maximum penalties and the forfeitures of two of the three (Smith and Zuriff) were significantly higher than Noah's.  Moreover, at least one of the defendants (Zuriff) ran a business dedicated solely to bookmaking.

- *Fourth,* Noah's remorse extends well beyond words, as he has conducted himself since his arrest in a way unique among the defendants:  we know of no other defendant who has used this past year to do so much good for those in need *and* to meet with the government to assist it without any Guideline-related benefit.

- *Fifth*, Noah is, at his core, an extraordinarily good person, having contributed so much to the lives of so many people without ever being asked to do so, and preserving their dignity in the process.  He is a young man with immense talent to help others.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 3

Based on these factors, we hope that the Court will allow Noah to continue to apply himself in the constructive directions he has charted this past year.[1]

## I.      Nature and Circumstances of the Offense (18 USC § 3553(a)(1)):  Noah's involvement in and knowledge of the group's bookmaking activity was confirmed to have been limited.

We understand that the Court has a keen understanding of this case from having sentenced a number of defendants, including three with connections to the portion of the case in which Noah was charged (the betting group titled by the indictment as the Nahmad/Trincher Organization).  Most of this group's activity involved betting *against* bookmakers or against other bettors at odds without a built-in commission.  That was, as has been confirmed, almost exclusively the part of the group's activity in which Noah was involved, utilizing his ability to try to pick winners and occasionally interacting with bettors who made bets.

To the extent the Court considers it relevant, at the time Noah was involved in this group's activity, he did not realize that he was doing something that crossed the line.[2]  He has been very clear, as are we, that this does not diminish the fact that he is guilty and that he alone is responsible for not doing more to definitively determine where the legal line was.  He has no excuse – and does not make any excuse – for his failures.  He pled guilty and is genuinely remorseful, having clearly and repeatedly acknowledged his responsibility, without equivocation, to every friend and family member with whom he has spoken (as the letters sent to the Court confirm).[3]  Even in these private conversations – settings where it would have been easy to deny responsibility – he has never tried to excuse his misconduct.

We provide below the basis for Noah's admittedly misguided belief that he was on the correct side of the line but we do want to emphasize that in providing the basis for Noah's once held belief neither he, nor we, are suggesting for even a moment that these facts diminish his guilt.  They serve, instead, only to help fill out the picture of the kind of person he is: a person who, we respectfully suggest, would not undertake conduct brazenly or with utter disregard for its legality.

---

[1]      We very much appreciate the Probation Office's efforts to gather and review a massive amount of potentially relevant material, including the letters reflecting Noah's post-arrest efforts to make amends and the letters sent in by those who know Noah.

[2]      In fact, on his tax returns, he listed his occupation as a professional gambler and carefully listed his yearly winnings.

[3]      For the Court's convenience, we have collected at Tab B all of the letters written about Noah. They are arranged alphabetically.  We asked each writer to briefly describe his or her own background so the Court would have a bit more context to evaluate their comments.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 4

While Noah always understood that bookmaking was illegal, his belief that betting was legal was based on a number of publicly available items in print, on the internet, and elsewhere. Although Noah recognizes that he should not have taken sufficient comfort from these sources, they contributed to his understanding at the time.  Typical of several website statements were the following two: "Unless you own and operate an illegal sports betting site, you will not go to jail for betting on sports online" and "Provided you do not attempt to establish your own online gambling site, then you should have nothing to worry about. By simply playing the games, you are not liable for any crimes."  On *Sixty Minutes*, an in-depth profile of Billy Walters, the leader of a highly successful sports gambling group, observed that "Walters joined a now infamous syndicate called the computer group which revolutionized sports betting in in the 1980s by feeding data into computers" and four separate indictments were thrown out.[4]  The piece concluded by noting that Walters "went on to build his own betting business.  He became better than the bookmakers at predicting which team would win and by what margin."[5]

In the months before the indictment, the group began accepting bets from a handful of individuals (friends of other members in the group) where these individuals who were betting against the group got to choose the team they wanted to bet on.  The odds at which they bet most often mirrored the odds set by offshore bookmaking sites.  Noah knew of this activity while it was occurring but, as the Probation Report confirms, his stake in the profits and losses was small (roughly 3-5%) and his direct involvement was limited:  he did not find the individuals who placed these bets and because the individuals betting against the group chose the side they wanted using odds taken from online websites, Noah's insight was less relevant.  As the PSR notes at ¶ 30:

> The betting group led by Nahmad and Tricher engaged in some bookmaking activity.  With respect to the bookmaking activity, Siegel's involvement was minimal: he had limited knowledge of it and derived a very small percentage of its profits and losses (as low as 3-percent).  He did not find the bettors, he did not set the odds, and he did not fund the bets.  Siegel's involvement in the group was almost exclusively in the pure betting activity, which

---

[4]     Citations for the three quoted items are, respectively, www.legalbettingsites.com/; www.legalgambling.net/articles/why-fears-of-being-arrested-for-online-gambling-are-unfounded.html; www.cbsnews.com/videos/sports-betting-billy-walters/.

[5]     A well-respected judge of a different circuit, Raymond Pettine, found that "Congress did not contemplate prohibiting the activities of mere bettors, even where, as with [the defendant], they bet large sums of money with a great deal of sophistication."  *United States v. Baborian*, 528 F.Supp. 324, 328-29 (D.R.I. 1981).  Noah did not know of Judge Pettine's decision at the time, but his decision suggests that the betting advice to which Noah was exposed, even if wrong, was not unreasonable on its face.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 5

involved betting against other individual bettors and against bookmakers.

Although this activity was a lot closer to bookmaking, which Noah knew was illegal, Noah believed, wrongly, that it stopped just short because, for example, the group did not advertise or solicit bettors, the group did not seek bets on both sides of the same game to reduce or eliminate risk (which bookmakers typically do, seeking to profit from the built-in commission they charge bettors), and the bets were against extremely wealthy friends of some other group members who regularly bet against their friends in golf, poker and other games. Again, he and we fully understand that his belief was misguided, wrong and does not diminish his guilt. He should have done more to identify the boundaries of legality.

In the end, Noah is the first to understand that he did wrong and has no excuse for having done so. He put it best when he wrote in his letter to the Court (attached at Tab A):

> I am genuinely sorry and ashamed. Nothing can excuse what I did, and I only hope that I have shown, in some tangible way, that I have learned from this past year since my arrest and that I am committed to a new path….

> I am totally responsible for not doing everything I could to check whether this or any other betting activity was legal. I should have known better and regret it to this day….

> I can never forgive myself for having dishonored my family. What makes the past months most difficult is the image of my father on his death bed: here was a man who was dealt the worst blow life can deliver and yet he remained committed to doing good for others and never once deviated from the highest moral path. With all of the blessings I grew up with – particularly with parents like my mother and father – I am pained that I have fallen short.

II.  **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment ((3553(a)(2)): Noah's offense is relatively less serious**

In discussing this factor, we do not suggest for a moment that Noah's crime was not serious. But if this statutory sentencing factor has any meaning, it presumably describes a continuum of offenses, with some offenses more serious than others. Here, the fact that the government offered a two year felony to capture Noah's culpability (where most of the other betting group defendants pled guilty to five year felonies) suggests that his offense was relatively low on that continuum. In addition, Noah's guilty conduct was not tinged with other criminal activity outside of sports gambling – unlike other defendants who have pled guilty in this case,

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 6

the government did not allege that he participated in art fraud, extortion, illicit poker games, or tax offenses.  Moreover, the government felt that no restitution was appropriate (a meaningful statement given the statutory mandate where an offense victimizes individuals).

**III.    The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct (18 USC §3553(a)(6)): The felony offered by the government and the forfeiture it requested from him suggest that Noah's culpability is no greater than the other defendants who have been sentenced to probation.**

The plea offered by the United States Attorney's office to Noah was meaningfully lower than every other defendant connected to his portion of this case who has been sentenced so far. Noah's statutory exposure was a maximum of two years; all other sentenced defendants connected to the betting group (there have been three) were offered and pled to five-year felonies.  In addition, Noah was required to forfeit significantly less than two of those three other sentenced defendants.[6]  This disposition presumably reflected a judgment about Noah's relative culpability.  It was not driven by any adverse legal ruling or time constraint.

Eight defendants in this case have been sentenced thus far.  Three of the eight were connected to Noah's portion of the case (the betting group) and all three of them received probation.[7]

_____

[6]    At his plea, Noah relinquished his rights to $400,000 of the monies frozen at his arrest.

[7]    With respect to the other five defendants (*i.e.*, sentenced defendants unconnected to Noah's portion), three received probation and two received jail time.  The two jailed defendants, Kirill Rapoport and Edwin Ting, are distinctively different.  As the Court observed, Rapoport's conduct involved violence and Ting had a prior conviction for precisely the same activity and received a sentencing enhancement for being a leader:

> I think a substantial and real sentence is warranted by virtue of the fact . . .  that this was not Mr. Ting's first offense, that he was previously arrested and convicted for precisely or pretty much precisely the same conduct. . . . [T]he fact of the matter is that he knew full well and firsthand what could happen if you engaged in the kind of conduct that he engaged in here, and the fact that he was previously convicted did not deter him from doing so.  I think that is significant and a significant factor in determining an appropriate sentence. . . . In addition, as the government points out, Mr. Ting has received an enhancement as a leader or organizer or manager of the conduct:

Ting Jan. 21, 2004 Sentencing Tr. at 37:24-38:7.  Neither of those two characteristics applies to Noah: (i) Noah was never before in trouble with the law (in fact, he believed, though wrongly, that his conduct was lawful) and (ii) Noah did not receive any leadership enhancement.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 7

Specifically:

- Bryan Zuriff received probation with six months of home confinement, having pled guilty to a five year felony and a $500,000 forfeiture. Zuriff performed an indispensable role for the group, finding betting sites for the group's bets. He also operated his own sports book, which was substantial.

- Justin Smith received probation with three months home confinement, having pled guilty to a five year felony and a $500,000 forfeiture. Like Zuriff, he found betting sites for the group's bets and accepted their bets, but the Court noted that he was less culpable than Zuriff because "he didn't have his own sports book" and was not "a ringleader of the criminal conduct" – *both of which also distinguish Noah from Zuriff.*

- David Aaron received probation with no home confinement, having pled guilty to a five year felony and a roughly $50,000 forfeiture. He, like Zuriff and Smith, found sites to place the group's bets.

Finally, in considering where Noah fits within the array of defendants in this case, we hope the Court will agree that the absence of other misconduct is significant: the government did not allege that Noah was involved in the charged extortion, the charged fraudulent art sale, or the illicit poker activity in the indictment, nor was he alleged to be responsible for any tax offense or violence, unlike several other defendants.

## IV. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct: The Genuineness of Noah's Remorse and the Devastation to His Life from this Case are Powerful Deterrents

After reviewing Noah's letter to the Court and the letters sent in by others, we hope the Court will agree that Noah's remorse is deep and sincere and that the case has had a destructive impact on his life. This will hopefully help assure that no additional deterrence is necessary.

### A. The depth and sincerity of Noah's remorse

We believe that Noah's use of the year since his arrest is unique among the defendants in this case.

Since his arrest, Noah has made sustained commitments to serve the community: teaching Chess and developing new tools that will synthesize health and education. We respectfully suggest that these activities were not undertaken simply for sentencing. Instead, they stem from the qualities Noah has exhibited throughout his life.

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 8

In addition, Noah has disengaged from sports gambling (even legal gambling), which says something about the lessons he has absorbed from this case.  And he volunteered to meet with the government to answer their questions, which he did a few months ago.

Noah's remorse begins with his own words.  In his letter to the Court, he has embraced his responsibility for violating the law: "I am totally responsible for not doing everything I could to check whether this or any of my other betting activity was legal.  I should have known better and regret it to this day."  This is what he genuinely believes, as his friends and family have confirmed.

From his arrest on, Noah has been clear about his responsibility in even his most private conversations.  He has made no excuses when interacting with close friends and family, with whom it would have been easy to seek to justify or excuse his misconduct.  Every one of the people who wrote to the Court remarked on Noah's forthright acceptance of responsibility and his unwillingness to cast blame on anyone but himself.

David Wexler, for example, recalled how:  "Soon after he was arrested and this began I sat with Noah over coffee and didn't recognize my friend – it broke my heart.  He was pained most, he said, by letting others down."  His close friend Doug Mishkin similarly noted how his discussions with Noah since his arrest have led him to "know how deeply he regrets having conducted himself in an area of the law without being sure that his conduct was legal" – how "he is profoundly remorseful for having broken the law, accepts full responsibility for his conduct, and is eager to make amends."  His long-time companion Larisa wrote how "[a]s difficult as this has been for all of us, Noah had the most trouble with the guilt he bears because, as he has told me, he should have known better."

Noah's mother Martha poignantly described how she has:

> talked to Noah endlessly about this and know how devastated he is for having put all of us through this, and I know how much he wants to do everything to make things better.  He makes no excuses.  He blames himself and no one else.  Except for the untimely and tragic death of their father 6 years ago, this certainly has been the most devastating thing that our family has ever had to go through.  It has changed us forever as a family, both emotionally and socially, and the scars, I fear, will be there forever for all of us.

Noah has spent the year since his arrest showing, in concrete ways, that his remorse is sincere.  He has met with the government and he has devoted himself to serving an underserved community.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 9

1. <u>Meeting with the Government</u>

Noah volunteered to speak with the government about gambling in general and about any of the defendants and other individuals about whom the government had questions. The government was eager to have Noah do this and on January 13, 2014, he met for two hours with a prosecutor and the case agent, answering their questions and offering to meet again to answer any other questions the government might have.

This was not part of any effort to get a cooperation letter or change his status. Noah urged us to suggest the meeting because he thought it was the right thing to do.[8]

2. <u>Service to an underserved community</u>

Immediately after his arrest, Noah, on his own, stopped gambling and he threw himself into efforts to give back to the community.

After his arrest, Noah began volunteering as a chess instructor for public school age children of every income level and background. As has been confirmed, he religiously devotes four afternoons a week (nearly 300 hours to date), volunteering at two organizations: the 14th Street Y and the Empire Children's Program. These programs include a sizeable number of children from families in financial and/or emotional distress.

Noah uses chess as a way to help young children gain confidence while developing analytical skills that can benefit them in the classroom and beyond. The letters both organizations wrote are, in my experience, unusual: they do not simply verify Noah's attendance but extol the impact he has made on the lives of young children.

The Director of Youth Programs at the 14th Street Y, knowing of Noah's guilty plea, described how Noah has:

> demonstrate[d] kindness, patience and a love of chess to our students here. He has taught 2.5 semesters (Spring 2013 and Fall 2013) of chess to children between the ages of 5-10 years old….He is still a volunteer for our Spring 2014 semester and his class is one of the most popular. The children ask for him specifically. …Over the course of his time here he has taught approximately 40 children how to play chess. He has not missed a single day of teaching and

---

[8]     In a similar vein, it may also be relevant to the Court that Noah chose not to fight the government in its case. He also made no statements publicly, through his counsel or in court that in any way challenged or disrupted the government's case. Although neither is recognized in the Guidelines, these actions, along with the meeting he had with the government, may be considered if the Court wishes to under 18 U.S.C. § 3553(a)(1). *See, e.g., United States v. Fernandez,* 413 F.3d 19 (2d Cir. 2006).

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 10

has demonstrated a love of children and teaching.  We feel lucky to have him as a volunteer.

Lori Jimenez-Estrada, the executive administrative director of the Empire Children's Programs, also wrote how deeply impressed she has been by Noah's commitment and his gifted teaching.  She described how:

> Noah has been an extraordinary presence for our children.  He is now entering his third semester teaching chess to children from 4 to 13 years old.  The children in our program absolutely love his chess program.  He has that rare ability to teach difficult concepts without making them seem difficult and, at the same time, making sure the children have fun.  He is truly patient and kind and has not missed a single day of teaching.  The interactions between him and the children show that he has that rare gift that makes a teacher memorable.  We continuously receive positive feedback from our families with regards to Noah's class. We are blessed to have him. … I can tell you, without reservation, that we are fortunate to have Noah and hope to have him for many years to come.

Noah's impact with these children reflects his character.  The qualities identified by Ms. Jimenez-Estrada are the same qualities his cousin Max Irwin recalled from when Noah taught him chess during the ice storm of 1989 – how "[e]ven from such a young age, Noah had an aura of maturity in knowledge – and through that knowledge, invited others to learn and enjoy.  It is true that he was admired as a prodigy, but the true gift was his inspiration and kindness…."

In addition to this chess teaching, Noah also has been continuing to develop a program to help school children stay fit while they learn.  The program would include a standing desk, exercise balls and guided meditation to encourage children to move during class while maintaining moments of peace to sharpen their minds.  His partners include a former Peace Corps volunteer, a PhD in educational policy and a Harvard graduate consultant, and they have done a vast amount of research to confirm that the program significantly improves the classroom setting and helps students and teachers alike.  One of those partners, Silvie Snow-Thomas, recalled how when she returned two years ago from the Peace Corps assignment that Noah encouraged her to take, Noah:

> brought an idea to my attention that he had to help kids in the classroom.  We're still working together (even through this challenging time) on this project, one that we think can help get kids healthier starting in the classroom tying in meditation and standing desks into school curriculums.  Noah has been pushing me, and a small group working alongside us, to make this into a successful non-profit organization; that is our goal.  It has been a

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 11

pleasure to develop this idea with Noah and I definitely look
forward to continuing it.

All of these activities have been ways for Noah to use this case and his conviction toward
a better end.  As his old friend Tyler McGill observed:

> I met Noah in New York shortly after the indictment.  Noah was
> alone in his apartment.  There was a vacantness and despair in his
> eyes that I had never seen in him before.  All we could do together
> was walk around the city.  We walked for miles that first day back
> in New York.  We wandered aimlessly, searching for words and
> solutions to this terrible situation in which Noah knew he had
> gotten himself.  It was both heartbreaking and staggering for me to
> witness.  But in the past few months, with his work teaching
> children, he seems to be a different person, rebuilding his life.

In the end, Noah himself may have captured best how much he has tried to put into action
what this case has taught him:

> My arrest shook me deeply, as it should have.  I realized I had no
> one to blame but myself.  And if there is a silver lining, it is that I
> now had time to take stock of my life.  I decided that I had been
> wasting many hours of my life.  I decided to return to doing
> something that had always brought me a sense of fulfillment and
> peace: teaching children through chess.  I remembered how many
> valuable lessons in life I had learned from chess.  I remembered
> that it was the activity that my father and I had shared from an
> early age.  I began volunteering as the chess coach at the 14th
> Street Y in the spring of 2013 and continued teaching chess during
> the summer at the Empire Children's camp at the Ella Baker public
> school with the Empire Children's Program.  I have continued
> teaching at both of these programs 4 days a week since this past
> fall.
>
> In preparing lessons, I began finding new ways to engage kids into
> chess.  The children range in age from 4-13 and I find that many
> really are taking to it.  There is a true beauty to it: despite so many
> different backgrounds and languages, chess can be understood by
> every player and is a great equalizer.
>
> The past year also has given me the time to focus more on a
> concept that I began working on just before my arrest: inserting
> fitness into educational settings through a "treadmill/standing

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 12

> desk" that allows the user to exercise while working, studying or learning….
>
> I also thought it important to share whatever knowledge and experience I could with law enforcement.  I met with the United States Attorney's office for a few hours.  As I mentioned in our meeting, I remain happy to continue our conversation if it would be helpful to them and to answer any other questions they might have. . . .
>
> I hope that I have been able to convey how grateful I am for all that I have been given in my life and how I can never forgive myself for having dishonored my family.

> *B.   Impact on his life*

Noah recognizes that he alone is responsible for the destructive impact of his conviction on his life.  Yet his punishment has been felt and will continue to be felt in many meaningful ways.  At 31, Noah's future job opportunities will be limited (unlike a defendant like Bryan Zuriff).  For example, he cannot obtain any job that requires a license so although he is so well suited for teaching, it is a profession from which he almost certainly will be excluded at least for a time.  In addition, his conviction will make traveling to his long-time companion's family in Slovenia far more difficult.  And, although not unique to Noah, he will be forever followed by the intense negative publicity that initially surrounded this case – a lifelong impact on him, his family and future career.

## V.   History and Characteristics of the Defendant (18 USC §3553(a)(6)): Noah is a young man of great compassion and goodness.

The depth of Noah's goodness is, we suggest, reflected in the unusual specificity of the letters written to the Court about him.  These are not perfunctory assessments of a defendant's character.  They describe a young man with immense potential to contribute to society – a young man who, as Your Honor so eloquently put it in another sentencing, has "talents that can do good in the world and [who] should use those talents to do good."

As mentioned above, Noah's efforts this past year since his arrest reflect a character built over 31 years.  He has spent his life doing so much good with hands-on efforts, indelibly changing the lives of friends and strangers for the better, never seeking anything for himself (even gratitude) and always extending his hand in a way that allows the recipient to maintain his or her dignity.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 13

### A.  Noah's compassion and generosity

Noah's legacy of compassion and generosity is notable for someone of his age.  Typical is the time, recounted by his companion Larisa, when Noah learned about a special edition of the Hess truck that "every kid wanted."  Noah searched for:

> a gas station that had them, bought all they had and followed that by buying 20 of the newest Barbie dolls.  A few days later on Christmas morning Noah encouraged me and two of his friends to join him in going to Beth Israel Medical Center to give these presents away to the kids in the hospital.  Going from room to room, some of these kids were having a really bad time and the expressions on their faces after we left them were so special.  You should have seen the surprise and the smiles.  They forgot, for that one moment that they were sick.  The staff was very pleased and it made a great day for everyone.

It is this same generosity of spirit that imbues the work he does with young children, teaching chess.  Noah's efforts to teach children span well beyond this past year.  Although he at one time was ranked as the number one player in the United States for his age group (representing America at three world youth championships), he is known for his extraordinary patience with students, nurturing them to love the game.  As his mother Martha wrote:

> Noah and I have had many discussions about managing a large group of students and I have learned many things from him. He is a natural teacher and has figured out how to engage and interest kids of all levels in this unique game. For just one example, he explained to me how having the kids stand around a chess board is so much more engaging for them than having them sit and look at a demo board on the wall from a distance. He has truly been excited about his teaching and went so far as to buy new chess equipment with his own money for at least one of the programs that did not have the budget to do so themselves.

Chess is a vehicle that Noah has used to enrich others in ways no other activity could.  His mother recalled the almost magical influence Noah has over children through this game; how when they "were invited out to Queens to celebrate the 6th birthday of the son of dear friends who were Cuban refugees [and] … got to their small apartment, there were 10 raucous little boys running around noisily.  Noah took the children aside. Within minutes, it became so quiet, and the adults were all stunned to suddenly see all these little faces mesmerized by Noah who had so deftly organized them all into playing some game, working his magic on them."  Indeed, his ability to inspire others through Chess is a defining feature of his character.  A former neighbor, Erin Aries, wrote how she and her husband were:

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 14

>    incredibly touched, and felt very fortunate, that this young man, in
>    his early twenties, obviously brilliant and already accomplished,
>    would commit his time to teaching our kids chess, a game that he
>    credits with having had a profound influence on his intellectual
>    development, so beneficial that he wanted now to share it for free.
>    This practice continued long after Noah moved to another
>    building….Noah has shared this generosity and care beyond my
>    family, as I see with his excitement and pride in teaching kids in
>    school and his general attention towards helping the younger
>    generation at large….It is incredibly humbling to see a young man
>    long to make such a difference in these kids' lives.

The letter from Connecticut College Professor Thomas Owen echoes the same insight. He wrote from the perspective of a lifelong teacher whose son Noah taught for over eight years:

>    Our relationship with Noah started when Matt was a four year old
>    preschooler.  He had just watched the movie "Searching for Bobby
>    Fischer" and wanted to play competitive chess. As he was already
>    trouncing me, I knew we needed help. Coincidentally, at our first
>    Connecticut College faculty meeting of the fall 2000 year, the
>    Dean of Admissions gave highlights of new entering students, and
>    mentioned a former National Chess Champion. I invited Noah to
>    dinner, he played a bit of chess with Matt, then proceeded to meet
>    with Matt at least weekly for chess instruction. During the
>    summers, when Noah was home, they would work by phone and
>    computer. The image of the two of them working in the student
>    center, Matt's small frame dwarfed in the large chair, with Noah
>    patiently teaching endgame strategies, is forever a fond memory.
>    How he could so effectively reach a preschooler is beyond me.  By
>    first grade, Matt had won the K-1 National Championship in
>    scholastic chess.
>
>    I think Matt did so well so quickly because not only was Noah an
>    effective teacher, he became a true mentor to my young son. This
>    relationship only deepened. I know they talked about many things
>    over the years, all of which made a favorable impression on Matt
>    and on us. . . .
>
>    As my wife and I are both teachers, we know we only have a short
>    period of time to work with a student. Noah has been a constant in
>    Matt's life, from a preschooler to a young adult about to graduate
>    from high school. His life has been the richer for his long

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 15

relationship with Noah and we are forever grateful for that serendipitous meeting fourteen years ago.

*B.  Noah's efforts to make the lives of others better without impairing their dignity*

Noah is that rare person who looks for opportunities to do good and by doing so, often spares others the need to ask for help.  So many of his friends remember how he was there, without being asked, to alter their lives in positive ways.  As Noah's friend Anna Brown described:  "what makes him really special in this way is that he never waits for a friend or someone in need to ask for help; he offers it, gently, whenever he senses there may be a problem. He does it in a way that does not intrude on the person's self respect."

The letters written about Noah by his friends are replete with specific examples of this trait.  David Wexler recalled how Noah:

relishes the true friends he has and goes out of his way to celebrate life with them – basically he wants everyone he loves to be as happy as they can possibly be.

I am a filmmaker and Noah has always gone out of his way to help me with my various projects.  He even invested in my first short I shot out of college; knowing there was no way to make a profit, let alone make his money back.  He did it so that I could essentially begin my career in the arts.

Ms. Snow-Thomas wrote how when she moved to New York:

I had no idea what to expect when I moved here — an admittedly naïve, wide-eyed 21 year-old with dreams of becoming a journalist in arguably the most cut throat publishing industry in the country. While my insecurities mounted, native New Yorker Noah made it his mission to make the city an inviting, interesting oasis for me…. Noah was integral in making New York not only my home, but also my safe place.

When she decided to leave a job with a good salary and glamor to go to Panama to do "environmental conservation and education work," everyone but Noah second guessed her. Noah:

was one of my most encouraging supporters, and stood by me (checking in regularly over email for my entire time away), and would generously take me out to dinner before I left, refusing to let

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 16

> me pay because he knew I was giving up a salary in order to serve our country as an international development volunteer.  He considered me a champion for wanting to make a difference in the world and use my skills to help a small group of people in rural Panama to improve their lives by reducing trash in their streets and pollution in their air.  I worked with the local elementary and junior high schools, teaching environmental education, gardening classes, and starting eco-clubs in tandem with the teachers there.  Before I left for Panama, Noah said, "When you get back, let's work on a project to improve the lives of people, even if on a small level.  Let's tackle a problem that needs to be tackled."

Doug Mishkin also recalled the encouragement Noah gave him as he pursued his passion to act, even showing up for Doug's first college performance unannounced, even though they were at colleges over 500 miles apart.  It is the same trait that prompted Noah to help Doug find a new place to work, leading him to be "more fulfilled and happier at my job than I had ever thought possible."  The same note was sounded by his friend, Rachel Lamson, who in college:

> wrestled with … whether I should pursue teaching.  Noah often told me he thought I'd be a great teacher, even when I felt like my future should somehow be different.  He encouraged me to pursue something in French, too.  In my senior year, Noah came to hear me perform in my senior voice recital.  I recall that a couple of my close friends weren't able to come, but Noah knew how important it was for me and was there, smiling in the audience, and asking me about specific songs afterwards.

Ms. Lamson is a teacher today.  As he had been and continues to be for his friends, Noah was there for Ms. Lamson when:

> Early on during grad school, before I'd established a doctor or even was able to get medical insurance, I had to make a trip to the emergency room.  Noah was the first person I called.  He spent the entire night with me there, and when I was discharged early in the morning, he took me out to breakfast.  Weeks later, when I received the hospital bill, I knew I would have trouble paying it.  Without me even mentioning it, Noah offered to pay the bill, knowing it would save me a lot of anxiety and stress.  It's hard to express in a short letter that a moment like that was one of only a thousand times Noah showed me what a true friend is.

The same kind of life changing impact was recalled by his sister Miranda and his companion Larisa.  Miranda recounted how:

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 17

> Noah is respected because he really listens to others and cares about what motivates them. When I decided to make the transition from magazine journalism to filmmaking and screenwriting, Noah was one of the only people who supported my decision. I wanted to follow my dream and many of my friends and family members were quite critical, which didn't help at all. Noah spent a lot of time discussing my decision with me and supported me completely.

Larisa described how Noah:

> has also been one of the main protagonists in helping many talented people prosper.  Aside from always pushing me to follow my passions as an artist, I have also seen him help others in many ways.  A close friend of his sister's is a pastry chef and had asked Noah to help her open a dessert shop in the East Village and Noah has been actively involved in helping the business prosper by advising and overseeing the businesses growth.  The shop is doing well and the chef had a recipe book published where she wrote a note specially thanking Noah.  No doubt, a young pastry genius like her might never have had the opportunity to flourish without Noah's help.

> On another occasion, a young film maker Noah had become friends with asked Noah to help him expand his film making business---Noah was glad to do so and his business has also been successful and the film-maker's career has been taken to new heights.

Even when his father unexpectedly died from pancreatic cancer just months after his diagnosis – even in the wake of having lost the person who played the largest role in his life – Noah characteristically thought of others.   His mother, Martha, captured it most poignantly in her letter:

> When his father became ill with pancreatic cancer in 2007, diagnosed only seven weeks before he died, it was traumatic to all of us, but Noah really rallied for me, his sister, but most of all for his dear father.  Calling and visiting daily, he actually moved back in with us as his father's condition worsened. Even though he was truly devastated by the situation, Noah was able to stay strong and faced his father's illness and death with such maturity, bravery and compassion, insisting on asking me as well as the doctor point blank about his prognosis.  There was no avoiding or softening the

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Honorable Jesse Furman
March 27, 2014
Page 18

> truth for him, and he faced it head on as heartbreaking as it was.
> Later, in the weeks and months of my having become a widow,
> Noah was there for me anytime I needed him. He called me daily
> and if he heard in my voice that I was upset, he would drop
> whatever he was doing to come and meet with me even if I didn't
> ask him to. His sister, Miranda, had a similar experience with him.
> He was there for us in so many ways then that his father certainly
> would have been proud, and I never could have gotten through that
> terrible period without his love and support.

His aunt Barbara Lovenheim similarly described how, when Noah's father:

> was diagnosed with stage three pancreatic cancer. We were all
> stunned and overwhelmed with grief. My sister was a wreck and
> the children were traumatized. I know this hit Noah particularly
> hard, because Herbert was not only a father, but Noah's champion
> and closest friend. Throughout the two months that preceded
> Herbert's untimely death, Noah became a real anchor for the
> family, visiting the apartment every day, often bringing dinner and
> gorgeous orchids – Herbert's favorite flowers. When the end
> inevitably came, Noah was devastated. But he took it upon himself
> to fill Herbert's place and look out for his mother and sister.

Noah was there for his cousin Janet Lovenheim as well:

> when the father of my children died quite suddenly in Florida just
> three years after Herbert [,] Noah arranged for Martha, Miranda
> and himself to come to Florida as quickly as possible. Not only
> was his presence a blessing for my children and for myself, but I
> learned later that Noah had put in tremendous effort to help ease
> their pain. Noah brought along games to play that they each
> enjoyed. Noah also made sure that everyone was fed by arranging
> for food to be there at all times. He consciously went out of his
> way to help, hoping to minimize the suffering of my 3 children and
> myself.

These were the same qualities from which he drew when he ran up fourteen flights of
stairs to his 90 year old grandmother during a blackout to ensure that she knew that she had
someone to take care of her; who flew to see his other grandmother as she slipped deeper into
dementia to be with her in her nursing home; who insisted that he perform his full Bar Mitzvah a
second time in Rochester so that his frail grandfather could experience it. And it says a great
deal about him, we suggest, that Noah would take the time to make the other residents of these

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 19

nursing homes take part and feel connected, "making it a very special day there for everyone" as Noah's mother Martha described.

In an era too often marked by the physical and emotional distance among family members, Noah's actions are, we respectfully suggest, noteworthy.

       C.     *Noah's humility*

Noah's humility is a trait that nearly every letter writer mentioned or implied.  Ms. Snow Thomas, for example, wrote of how she has "seen Noah make many homeless men smile" – how:

> Noah has engaged dozens of gentleman who play chess (and effectively live) in Washington Square Park.  From the letters you've read by now, I'm sure you know that Noah is a Chess Master.  Truly it's like nothing you've ever seen:  Noah sitting down to a stone table on even the coldest, most blustery of a winter day with the guys who ask tourists to play them for a few bucks.  With Noah in this situation, there is no gambling, rather he pays them for the chance to get great competition, to practice his craft, to help them out where he can, and to make everyone watching smile.  The idea of social status has never been important to Noah; "class" doesn't matter.  It is about the people he meets along the way and the connections he can make.

Lisa Rubiner, a relative, recalled how Noah stopped competing in international chess competitions for a time after learning that "in Armenia there were so many players who were better than himself, but he had never encountered them before because they couldn't afford to travel anywhere. What's the point, Noah said, of playing lesser players who travel just because they can afford it."

Noah's mother Martha may have captured it best in her letter:

> There is one final quality about Noah that makes him very special to people and that is his sincerity and humility. With all the accolades he had earned over the years in chess (National Master at age 13, US representative in 3 World Youth Championships, to name a few), he never once would boast about it to anyone and often wouldn't even mention it.  This was highly unusual considering that he graduated from a very competitive private school. His attitude was that he could always do better, and for him, it was more of a personal challenge, so he never let it go to his head.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 20

\*       \*       \*

It is the combination of compassion, selflessness, and humility that has made Noah literally the role model for countless people – the kind of person to whom close friends and recent acquaintances look for advice.  Noah is, as friend Tyler McGill described, "one of the greatest men I've ever met."  His cousin Max Irwin credited Noah with causing Max to be productive: "even though he is four years my junior, learning chess through Noah, and striving towards his accomplishments, I learned the analytical patience and thoughtfulness necessary for a successful computer programmer.  He may not have realized it, but my admiration and kinship with Noah gave me confidence to carve my own intellect, and honestly I do not feel I could have done so without him."  As his sister Miranda put it:

> my friends all love him. Several of them have gone to Noah for advice on and help with business, creative projects, and even personal troubles. I cannot tell you how many times they've told me that the best advice they received was from him. Friends with all sorts of backgrounds – a kinetic artist, a singer, an entrepreneur, a pastry chef – value his objective opinions and keen observations. Even when my friends come to me with their problems, they will inevitably ask, "What does Noah think?"

**CONCLUSION**

Noah Siegel's guideline level is 6-12 months, allowing the Court to impose a non-custodial sentence.  We hope that the Court will consider doing that based on:

- Noah's confirmed limited involvement in and knowledge of the group's bookmaking activity and his genuine, though mistaken, belief that his activities for the group were lawful;

- where Noah fits within the constellation of defendants in this case based on (a) his being offered a plea with a significantly lower maximum than other defendants and a forfeiture that is materially lower than many of the other sentenced defendants; (b) the absence of allegations of non-sports gambling criminal activity; and (c) his post-arrest efforts in the community and his meeting with the government;

- the depth of his remorse; and

- his fundamental goodness and his life-long capacity to help others in meaningful ways.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

Honorable Jesse Furman
March 27, 2014
Page 21

In light of the above, we hope that Your Honor will permit Noah to continue to move forward in the socially positive directions he has charted since his arrest – to continue to use his talents to "do good in the world."

Respectfully yours,

Peter A. Chavkin

cc:    AUSA Harris M. Fischman