# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Jim Walden
Direct: +1 212.351.2300
Fax: +1 212.351.5300
JWalden@gibsondunn.com

April 17, 2014

Hon. Jesse M. Furman
United States District Court
Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re: *USA v. Tokhtakhounov, et al.* / 1:13-cr-00268-JMF
    Defendant Molly Bloom

Dear Judge Furman:

We write in anticipation of a sentencing proceeding for Molly Bloom, which is currently scheduled for May 2, 2014.

Molly has timely accepted responsibility for hosting a poker game, which is the only allegation against her in the indictment. This poker game long predated Molly as a contest among friends and morphed into a "raked" game.[1] Although she acquiesced to the rake, it was neither her idea nor her desire to do so. And, within a few months, her co-host and the players forced her out of the game in any event.

Given Molly's minor role in the offense conduct and the limited duration of her involvement, and for the additional reasons set forth below, we respectfully ask the Court to impose the most lenient sentence possible.

## I.     The Offense Conduct

Molly is neither a gambler generally, nor a poker player specifically. Based on her success in playing host to a poker game organized by a well-known actor in California (the circumstances of which are addressed in Section III below), she was recruited in late 2008 to host a poker game in New York. That game had been ongoing for more than 10 years when Molly began hosting it. She took on the job of facilitating this poker game in early 2009.

---

[1] A "rake" is a forced tax on each hand, which can be used to pay winning players, as well as to pay a profit to "the house."

Her job, squarely put, was to "class up" a poker game that incredibly rich men had been playing at kitchen tables and in basements for years. By mid-2010, she was fired as host, although the game continued without her.

Thus, Molly's activities were limited to hosting this game for about 18 months. She identified game venues, hired cocktail waitresses, and coordinated with players. Over time, the players expected her to collect money from losing players and pay money to winning players. Although collecting money from losing players was often difficult—and she was often "stiffed" by even the wealthiest of players—she never resorted to improper collection methods. Instead, she covered losses with her own money to avoid acrimony. When serious problems arose in the game, the leading players generally resolved the difficulties themselves.[2]

The players were very rich men, including both businessmen and several well-known individuals from the entertainment industry, who chose this activity for their amusement and enrichment. In a very real way, the players were the owners and ultimately the operators of the poker game. Molly served as nothing more than an at-will employee of the players and, when it suited them, they fired her. None of the player-owners of the game were prosecuted in this matter.

Molly's activities would likely have fallen below the Government's attention if it were not for the imposition of a rake on the game in the late spring of 2010. The rake was not Molly's idea, although she acquiesced to it. When Molly ran the game alone, she profited only through voluntary gratuities. Ironically, the co-host, who suggested the rake, forced Molly out of the game just a few months later.[3]

Molly left New York by March 2011, and never participated again in hosting poker games. She was offered opportunities to participate in other illegal gambling activities, such as book making, and she declined. Thus, her participation, such as it was, lasted only about 18

---

[2] As one example, in approximately November 2009, Molly discovered that a player brought extra chips to the game, thus diluting the value of the house's chips and effectively cheating the other players. Molly brought this to the attention of the two leading players, who resolved the situation by imposing a special assessment on all players to cover the lost monies and authorizing Molly to purchase unique chips for future games.

[3] The co-host was prosecuted in this matter based on his poker and other gambling activity. In his sentencing submission, the co-host took responsibility for making the decision to institute the "rake" as a mechanism to avoid the necessity of covering losing players' debts.

months; furthermore, the period in which she participated with the rake was only a few months. On this basis, Molly is one of the least culpable people charged in this indictment, and certainly *the* least culpable of the poker defendants.

After she was arrested on April 16, 2013, Molly was permitted to voluntarily travel to New York to answer the charges. She appeared without incident. This Court released Molly on a $100,000 personal recognizance bond and she has been incident-free during her time on pretrial release. After her plea in this matter, the Court removed all domestic travel restrictions. Again, her pretrial conduct has continued to be unblemished.

## II. Applicable Guidelines Range

On December 12, 2013, Molly pled guilty to Count 20 of the above-captioned indictment, admitting to her role in hosting poker games in violation of 18 U.S.C. §§ 1955 and 2.

If the Court accepts the Government's view—that Molly's role qualifies her for a minor-role adjustment under § 3B1.2(b) of the U.S. Sentencing Guidelines, as the facts amply justify—Molly's adjusted offense level is 8. Because she lacks any criminal history, Molly's adjusted guidelines range is zero to six months.

## III. Molly's Background

Molly is an intelligent, athletic young woman, who was raised in a small town in Colorado. Prior to her arrest in the case, she had no criminal record. As the attached letters attest, she is a caring, "kind-hearted" person, who gives generously of her time and resources to her family and friends. Upon resolution of this unfortunate chapter in her life, Molly "has a great deal to offer" and has expressed a demonstrated desire "to be of service to this world." She is repeatedly described as "compassionate," and her friends and family "trust Molly completely and wholeheartedly." Once Molly gets back on a sure footing, she has dreams to create charter schools for girls and programs to help young women acquire skills and cultivate entrepreneurial pursuits.

Molly offers no justification for her life choices. She understands that she made mistakes. We offer the following information by way of explanation, not excuse.

Molly was an excellent student. She held a 3.8 grade-point average at the University of Colorado while skiing for the U.S. Development Ski Team and maintaining a full course load. Her participation on the U.S. Development Ski Team was not an easy accomplishment. At age twelve, Molly was diagnosed with scoliosis, a disease that caused severe curvature of the spine. After undergoing a seven-hour spinal surgery, which fused eight of her vertebrae

GIBSON DUNN
Hon. Jesse M. Furman
April 16, 2014
Page 4

together with a metal rod, Molly's doctors told her she would never ski again. Determined to succeed, and to finally win the approval of a father too focused on his sons' accomplishments, Molly ignored her doctors and skied through the pain. In 1998, she finished third in the country at the NorAm Tour in the Freestyle skiing event.

That success did not fill the hole in Molly's life caused by her inability—real or perceived—to meet the expectations of others, including her family. She decided, wrongly in retrospect, to take a break from college and skiing, and move to California to find her own way. She slept on a friend's couch and took waitressing jobs, which subjected her to a string of lecherous and abusive employers.

In 2004, one of Molly's better restaurant bosses, recognizing her intellect and abilities, hired her to help his real-estate investment company. At first, Molly ran errands and filed paperwork. Over the course of a year, Molly rose to the position of office manager. Despite Molly's acumen at helping to run the business, her boss continued to treat her poorly and demand personal favors. In that category, the boss "decided" that Molly should host a poker game, in which he had been a regular player. Molly knew nothing whatsoever about poker. She taught herself what she needed to know, and, beginning in 2006, played host to a self-important and spoiled group of millionaires and celebrities (a well-known actor ultimately made most of the important decisions about the game, including player selection). Among other tasks, she catered to their drink and food orders, ran personal errands for them, and helped make sure the game ran smoothly. By all accounts, the players appreciated her efforts, and she accepted gratuities as compensation. Molly believed the game was lawful, and our own review of California law confirms this understanding.[4]

Eventually, in late 2008, Molly was pushed out of that game and her job at the real-estate company. With an unfinished education and few career options, she decided to find another opportunity in the world of poker, which seemed to have growing legitimacy through highly-publicized charity and celebrity events and worldwide tournaments, such as the "World Series of Poker."

---

[4] California law expressly prohibits "percentage games," meaning any gambling operation where there is a fixed percentage rake. Under California Penal Code sec. 330, the game cannot be a percentage game (i.e., the poker game host cannot take a rake percent from the pot, but instead can take only a flat fee or time charge). Therefore, in California a poker game would be legal unless the game qualified as a percentage game. It is the rake itself that makes a poker game illegal under California law. See California Penal Code § 330.

That opportunity came through one of the players in the game she had hosted in California, the head of a significant hedge fund in New York. That individual also participated in a regular poker game in New York with other wealthy individuals, lawyers, celebrities, and media executives. The individual allowed Molly to "audition" for the job of host to the New York game. After hosting a few games, Molly passed this "audition," and the players accepted her as host at the beginning of 2009. At this early stage of the New York game, Molly believed her conduct here was lawful.

In the late spring of 2010, the New York players encouraged Molly to accept a "partner" as co-host (the "Co-Host")—a man with a shady background and sharp elbows. The players thought this proposed Co-Host could attract other rich players. Molly relented, and shared co-hosting duties with the Co-Host. Once the Co-Host joined, he realized two things, neither of which he found satisfactory. First, Molly's compensation was only through players' voluntary gratuities; although many of the players tipped well, others did not. Second, Molly often had to go "out of pocket" to pay winning players when the losers failed to pay in a timely manner. The Co-Host did not wish to continue these practices. Thus, he recommended the imposition of a rake.

Molly was uncertain whether the imposition of a rake—which seemed more like casino gambling than a friendly poker game among friends—would impact the legality of the game. She consulted a lawyer, who advised her that the rake likely transformed the game into a misdemeanor under state law. On that basis, she acquiesced, regrettably. What the lawyer failed to tell her is that state-level-gambling misdemeanors can qualify as federal felonies under 18 U.S.C. § 1955, the statute under which Molly was indicted.

Eventually, in mid-2010, the Co-Host forced Molly out of the game, and the players sent her on her way. She tried to host other, smaller games, none of which lasted.

The stress of dealing with an increasingly shady group of people—some of whom showed a willingness to resort to violence—caused Molly to suffer from depression and over-use pills and alcohol. Molly realized she was in over her head. When she learned in March 2011 that federal authorities were investigating the game, she realized the seriousness of the situation and left poker for good.[5]

---

[5] Back in early 2011, the existence of the federal investigation was leaked to Molly by a corrupt informant. This informant provided Molly with information allegedly concerning the scope and direction of the federal investigation, in which the informant claimed to be cooperating. Molly voluntarily informed the Government of the informant's misdeeds after her arrest in this case, and she provided documentation. We believe the Government found that information useful in assessing the informant's reliability.

Shortly after Molly returned to California in March 2011, her family observed her compromised physical and emotional condition. They made arrangements for her to enter a rehabilitation facility, and she attended voluntarily. By the time of the indictment in this case, Molly had cleaned up her act, discontinued her involvement in poker, and made strides to rebuild her career.

**Conclusion**

When this Court fashions a sentence, based on the Court's "own sense of what is a fair and just sentence under all the circumstances," see United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006), we hope the Court will consider six key factors:

- **Minor role**: Molly's role in the poker game—which long-predated Molly and still continues in her absence—was exceedingly limited. To our knowledge, she is the only defendant for whom the Government agreed to a minor role adjustment under the U.S. Sentencing Guidelines.

- **Limited duration of involvement**: Molly's involvement in the poker game was of limited duration, and importantly, her involvement during the "rake period" was only a few months. We understand the "rake period" to be the essence of the illegality in this particular poker game.

- **Decision to rake**: Before the player-owners recruited the Co-Host, Molly did not rake the poker game and accepted only voluntary gratuities as payment. Molly wanted neither the Co-Host's involvement generally, nor the rake specifically.

- **Termination of involvement**: Molly voluntarily terminated her activity in poker two years prior to the return of this indictment.

- **Providing useful information**: After her arrest in this case, Molly provided useful information to the Government about a corrupt informant.

- **Lack of criminal history**: Other than her involvement in this matter, Molly has led a productive life, without criminal or administrative entanglements.

When considering Molly's "history and characteristics . . . in determining the particular sentence to be imposed," see United States v. Thavaraja, 740 F.3d 253, 262 (2d Cir. 2014) (internal citations omitted), it is impossible to conclude that she would ever risk future legal

violations, such that the Court need impose anything other than a short term of probation. Molly is a bright and capable individual, who did not set out to break the law. When she realized that the "rake" likely risked her becoming a misdemeanant, she should have terminated her conduct. She knows that. However, had her then-attorney advised her that a state-law-gambling misdemeanor could constitute a federal felony—which is precisely the theory under which she was prosecuted in this case—she surely would have stopped, <u>as she did when she first learned of the federal investigation</u>.

Molly's friends and family have attested that this unfortunate experience has reignited Molly's "desire to be special and impactful in a positive way." In this regard, she remains "committed to using her experience, skills, intelligence, and her strong will, to help young girls see futures for them in the business world." Their unwavering support of Molly further underscores her strong rehabilitative potential, and reinforces the already strong likelihood that she will emerge from this experience stronger and more determined than ever to achieve her reimagined life goals.

For these reasons, we ask the Court to impose a brief term of probation and the minimum fine of $1,000. Molly's track record since she voluntarily left poker over two years ago has proven that she has every intention of continuing to be law-abiding. Therefore, we ask the Court to sentence Molly to a probation term of one year, which is the shortest term of probation authorized by Section 5B1.2 of the U.S. Sentencing Guidelines.

Respectfully submitted,

Jim Walden