E52JBLOS                    Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          13 Cr. 268 JMF

5   MOLLY BLOOM,

6                Defendant.

7   ------------------------------x

8

9                                         May 2, 2014
                                          3:00 p.m.
10

11

12  Before:

13                 HON. JESSE M. FURMAN,

14                                     District Judge

15

16                    APPEARANCES

17

18  PREET BHARARA,
         United States Attorney for the
19       Southern District of New York
    JOSHUA NAFTALIS,
20       Assistant United States Attorney

21  JAMES WALDEN,
    SARAH VACCHIANO,
22       Attorneys for defendant Bloom

23  Also Present:
         ROBERT HANRATTY, Special Agent FBI
24

25

E52JBLOS                          Sentence

1              (In open court)

2              (Case called)

3              THE COURT:  You may be seated.  Good afternoon to you.

4       Welcome.  We are here today for the purposes of

5       sentencing.  In preparation for today's proceeding, I have

6       reviewed the presentence report, dated April 22nd, 2014.  I

7       have also received and reviewed the defendant's submission

8       filed April 17th, 2014 which included letters addressed to me

9       from her parents, her brothers and various friends, and the

10      government's submission that was filed on April 18th, 2014.

11             Are there any additional submissions I should have

12      received?

13             MR. NAFTALIS:  Not from the government, your Honor.

14             MR. WALDEN:  Not from the defense, your Honor.

15             THE COURT:  All right.  Mr. Walden, have you read the

16      presentence report?

17             MR. WALDEN:  I have, your Honor.

18             THE COURT:  Have you discussed it with Ms. Bloom?

19             MR. WALDEN:  I have, your Honor.

20             THE COURT:  Ms. Bloom, have you red the presentence

21      report?

22             THE DEFENDANT:  I have, your Honor.

23             THE COURT:  If you wouldn't mind just moving the

24      microphone in front of you, that would be helpful.  Have you

25      discussed it with Mr. Walden?

E52JBLOS                         Sentence

1              THE DEFENDANT:  I have.

2              THE COURT:  Have you had enough time to go over with

3    him any mistakes in the report or anything you want to bring to

4    my attention?

5              THE DEFENDANT:  I have had time, your Honor.

6              THE COURT:  Have you have enough time?

7              THE DEFENDANT:  Enough time, yes.

8              THE COURT:  Mr. Naftalis, have you reviewed the

9    presentence report?

10             MR. NAFTALIS:  Yes, your Honor.

11             THE COURT:  Putting aside the sentencing guidelines

12   for a moment, are there any corrections or objections with

13   respect to the factual accuracy of the report?

14             MR. NAFTALIS:  No, your Honor.

15             THE COURT:  Mr. Walden?

16             MR. WALDEN:  None, your Honor.

17             THE COURT:  Hearing no objections, then I will adopt

18   the factual recitations set forth in the report which will be

19   made a part of the record in this case and placed under seal.

20             If an appeal is taken, counsel on appeal may have

21   access to the sealed report without further application to me.

22   As counsel are aware, I am no longer required to follow the

23   United States Sentencing Guidelines, but I am required to

24   consider the guidelines range in imposing sentence and must,

25   therefore, accurately calculate the guidelines range.

1          In this case, there was a plea agreement in which the

2     parties stipulated to a particular calculation of the

3     sentencing guidelines.  Am I correct that the calculation in

4     the presentence report is in accord with that agreement?

5          MR. NAFTALIS:  Yes, your Honor.

6          MR. WALDEN:  Yes, your Honor.

7          THE COURT:  All right.  Mindful of that, I am likely

8     to adopt the calculations of the presentence report, but I did

9     just want to press counsel a little bit on the applicability of

10    the minor role adjustment that is in both the report and the

11    plea agreement.

12         A minor role reduction is not available simply because

13    the defendant played a lesser role in the offense than other

14    participants.  It has to be minor as compared to the average

15    participants in the crime.  Here, as I understand it from the

16    presentence report, Ms. Bloom made upwards of a million dollars

17    from the rake that was taken even if it was not her idea and

18    done on only a temporary basis.

19         Now, it is the rare case, I would suggest, that

20    somebody who derives $1 million from illegal activity

21    constitutes or gets a minor role adjustment, but maybe this is

22    that case.  So discuss.

23         MR. NAFTALIS:  Your Honor, the government's view is a

24    minor role applied in part because the rake was not Ms. Bloom's

25    idea.  She had partnered with Eddy Ting in this high stakes

E52JBLOS                    Sentence

 1    game, and Eddy Ting insisted that the rake applied.  Without

 2    conceding that tips alone are not criminal, that is the focus

 3    of the government's case, which is the rake itself, and I think

 4    as your Honor picked up on where most of the money came from,

 5    given the fact she is effectively working for Mr. Ting and at

 6    his direction, was fired and withdrew from running games after

 7    the NYPD and FBI were investigating.

 8         In our view, she acted in a lesser role particularly

 9    with respect to the other five poker defendants.  That is why

10    we think the minor role applies.

11         THE COURT:  All right.  I take it she played a minor

12    role, in your view, relative to average participants in this

13    sort of crime and she was essentially operating as an employee

14    more than organizer or owner, if you will, of the game.  Is

15    that correct?

16         MR. NAFTALIS:  Yes, your Honor.

17         The game she was working for, she wasn't necessarily

18    the promoter of it.  She was working for the people who were

19    the players, and then across the spectrum with respect to the

20    other organizers in this case, those people were really

21    promoting their own games, texting people, sending e-mails

22    saying come to these games.  She was working at the behest of

23    these Wall Street executives.  That is our view.

24         THE COURT:  Mr. Walden, is there anything you want to

25    add?

E52JBLOS                     Sentence

1          MR. WALDEN:  I will address this in more detail in my

2    comments, but I think as Mr. Naftalis said, the owners and the

3    operators of this game were the players.  I will give examples

4    during my comments of the kinds of decisions they made, and Ms.

5    Bloom was clearly an at-will employee ultimately fired from the

6    game.

7          THE COURT:  All right.  So based on the parties'

8    agreement, absence of any objection, the representations of

9    counsel, and my own independent evaluation of the guidelines; I

10   do, therefore, accept the guidelines calculation set forth in

11   the report.  So using the November 2013 edition of the

12   guidelines, I find that the total offense level is 8, the

13   criminal history category is I, the guidelines range is zero to

14   six months imprisonment, and the fine range is 1,000 to

15   $10,000.00.

16          In the plea agreement both parties agree not to seek a

17   departure from that range.  Is that correct?

18          MR. NAFTALIS:  Yes, your Honor.

19          THE COURT:  Mr. Walden?

20          MR. WALDEN:  Yes, your Honor.

21          THE COURT:  I have, nevertheless, considered whether

22   there is an appropriate basis for a departure, that is, in our

23   terminology, as distinct from what has come to be known as a

24   variance, and I do not find any grounds for a departure.

25          All right, Mr. Naftalis, do you wish to be heard with

 1   respect to sentencing?

 2          MR. NAFTALIS:  Your Honor, very briefly.

 3          I think in this, this is one, especially compared to

 4   the last few days, one of the cases where the government agrees

 5   with the defense's view of happened.  While we do think it is

 6   serious conduct, we think the defendant was running a high

 7   stakes game where millions of dollars were getting bet.  As

 8   your Honor just addressed, she was really not the promoter of

 9   it.  In this case, we think she is the least culpable poker

10   defendant, as that is a term in this case, and certainly among

11   the least culpable in this case.

12          We're particularly struck by she was acting openly,

13   and she got a nickname poker princess.  She wasn't hiding from

14   what she was doing, but in our view she has fully accepted

15   responsibility in our view, which is actually exceptionally in

16   this case in our view particularly given the other sentences

17   the poker defendants got.

18          We think a guidelines sentence is appropriate, and

19   since probation falls within the guidelines sentence, that

20   would be our recommendation to your Honor.

21          THE COURT:  All right.  I have two relatively brief

22   questions for you.  One is in Footnote 5 of Ms. Bloom's

23   sentencing submission, she represents that she had essentially

24   been tipped off to the existence of I assume this

25   investigation, at least a federal investigation into the poker

E52JBLOS                          Sentence

1    activities and that she disclosed that and shared that

2    information with the government after her arrest.

3          Is that accurate?

4          MR. NAFTALIS:  That is accurate.  That was when I was

5    referring to her withdrawing effectively from what we are going

6    to call conspiracy, but withdrawing from these games.  It was

7    after it became known that the FBI was looking at this area of

8    New York City.

9          THE COURT:  And she did provide information?

10         MR. NAFTALIS:  Yes, she did.

11         THE COURT:  Also can you just articulate what the

12   basis is for the forfeiture figure in the case and in

13   particular given again the representation in the presentence

14   report that she made upwards of a million dollars from the

15   rake, how do you arrive at the $125,000 figure?

16         MR. NAFTALIS:  While the game was being run for people

17   who were millionaires and billionaires, she also ended up

18   reimbursing people when they stiffed each other.  Honestly,

19   while she made a million dollars, she reimbursed people, and

20   then she has also I believe forfeited the profits in another

21   litigation anyway.  So it is a combination of it is a lesser

22   role.  The fact she was fully disclosing what she made on her

23   tax returns, she apparently wasn't deducting what she paid out

24   to other people.  She is almost too honest on her tax returns,

25   as we understand from Mr. Walden.

1          THE COURT:  The other litigation is the litigation in

2   bankruptcy court in California?

3          MR. NAFTALIS:  Yes.

4          THE COURT:  Mr. Walden, do you wish to be heard.

5          MR. WALDEN:  Yes, I do, your Honor.

6          I am not sure I ever agreed with the writer who said

7   it is better to go wrong in one's own way than to go right in

8   someone else way.  I tend to believe it is best to go right in

9   your own way.  The woman who will stand before you today as a

10  convicted felon with all of the collateral consequences that

11  that entails is a woman that did try to go the right way, her

12  own way, and that doesn't mean she succeeded, your Honor, but

13  more importantly than her good intentions is the fact that once

14  she realized that she had made an error and once she realized

15  the gravity of that error, she did not resort to half-steps.

16  She did not resort to half-measures.  She did not justify her

17  behavior.

18         She did not engage in the cynical calculus of here is

19  how much money I'm making, here's how much prestige I have.

20  What are the chances I'm really going to be apprehended in this

21  poker game?  She didn't do any of that, your Honor.  She did

22  not succumb to the social pressures from her so-called friends

23  to stay with the poker business.  In March of 2011, as the

24  government told you, she walked away, she walked away for good

25  and she tried to rebuild her life.

1    Your Honor, today I would like to divide my comments

2    into three parts.  I first want to talk a bit about Ms. Bloom's

3    background.  I then want to spend a brief amount of time in the

4    events conduct, and I'd like to provide some information I

5    think you already know, but a little information to

6    contextualize your decision as to Ms. Bloom's punishment.

7    When I first introduced my comments with some

8    statements about Ms. Bloom and her background, your Honor, it

9    was extremely important to Molly that I say the following words

10   to you.  Molly is ever mindful of the fact that people come

11   through this courthouse and people have been in this courtroom

12   and people have been before your Honor that grew up with tragic

13   circumstances.

14   Molly, despite the fact that she had real adversity

15   and real difficulty in her life, is not one of those people.

16   She has two parents that are here in the courtroom.  She has

17   two brothers, two loving brothers, one of whom is here.  She

18   has an extended family, including cousin and grandmother and

19   many friends that are here to support her in court.

20   So when I tell you about the path she went on that led

21   this small town, middle-class girl into the world in which she

22   found herself, I am doing it hopefully to support a simple and

23   uncontroversial principle.  There was a time in these

24   courthouses when W.S. Griffin's words that the punishment must

25   fit the crime were all that mattered, and thankfully we live in

1    a more enlightened time where it is not just the crime, but the

2    person and the circumstances that matter.

3            It is in some cases more important who the person is

4    and what the circumstances are.  I can only imagine, your

5    Honor, the difficulty of your job as you, in a case like this,

6    sentencing person after person after person that you've read a

7    lot about but you have seen twice in your life, knowing you

8    take your responsibility seriously and their fate is in your

9    hands, you must be sitting there wondering who is this person.

10           And so when I give you some comments about Ms. Bloom's

11   background, it is not by way of excuse.  It is by way of

12   explaining who this young woman is.

13           Molly grew up by anyone's account in the world of

14   Alpha males.  Her father was a commanding figure in her home.

15   Her two brothers who were younger were overachievers and

16   impressive people in the extreme.  Her family was

17   understandably extremely proud of all of their accomplishments,

18   but no matter how the relative affections lie, it is true that

19   Molly grew up in a circumstance where she never quite found her

20   place in her family's orbit and where she felt, rightly or

21   wrongly, as though she could never quite measure up, and that

22   caused her at times to take steps that her family had

23   difficulty understanding, and it was a way to deal with I think

24   what is, having spent so much time with her, clearly her sense

25   of isolation and not feeling as though she belonged.

E52JBLOS                    Sentence

1              Her parents are here in the courtroom.  Her brother

2     Jordan is here in the courtroom, and I think that they can

3     understand and appreciate how the glow of her brother's

4     impressive accolades may have left Molly at times feeling as

5     though she was in the shadows, but Molly herself threw herself,

6     as we said in our sentencing submission, into her studies, your

7     Honor, and she was impressive in her own right.  She was an

8     overachiever in her own right.  She not only did well

9     academically, but at a very young age she was a talented skier.

10             At the age of twelve, she dealt with a serious

11    adversity, your Honor, when she developed scoliosis.  Her spine

12    curved dramatically over a very short period of time, and the

13    doctors advised her she needed to have full spinal surgery

14    which in those days were quite rare.

15             The aftereffects, the collateral consequences from

16    that surgery left Molly as a twelve-year old girl literally in

17    a hospital on her back for months.  The doctors told her when

18    she emerged from that very long, extended trauma that despite

19    the fact that all of her hopes for becoming something in the

20    skiing world were now going to end and she could no longer ski.

21             I say this to your Honor not because I think you

22    really care whether or not she was a good skier or not, but

23    because the person you're sentencing here is that same person

24    who despite old men with gray hair telling her she could never

25    ski again, despite her parents that were saying don't ski,

1    decided to do something unique and in a way spectacular.

2         I say that not because skiing is so hard, but because

3    the intense pain that she had to go through not just through

4    therapy, but every single time she got on a hill was palpable.

5    She would spend sleepless night after sleepless night because

6    she was wrapped in pain.  She would cry.  She had all of the

7    endurance needed, but none of it mattered.  She was focused as

8    a laser on doing something and she did it.

9         Not only did she rebuild her skiing career, but she

10   became nationally competitive so that she made the U.S.

11   Development Ski Team and placed third at the North American

12   Tour, but in freestyle skiing, freestyle skiing when she had a

13   12-inch rod that fused her vertebrae together, it is that I

14   think is a picture into who this woman is.  She wanted to

15   succeed.  It didn't matter how tough she needed to be and how

16   hard she needed to work, she wanted to succeed.

17        Molly blames no one for the fact that despite the

18   efforts that she put into her skiing and into the first three

19   years of her college, despite how well she was doing, for

20   whatever internal reason she still could not find a place where

21   she felt like she belonged.

22        I think it is fair to say, your Honor, for many years

23   the quality of the choices that she made and the terrible

24   treatment that she endured from other people was in large part

25   due to the fact that all she was trying to do regardless of

1    what pain or humiliation she had to endure was to find a way to

2    succeed, to find some landscape in which she could succeed.

3          So wanting to find a path, Molly moved to California

4    to look for work and opportunity, and regardless of whatever

5    your Honor has read, believe me when I say I was not a

6    glamorous life.  Molly was sleeping on a couch, waitressing

7    tables, running any sort of odd job that she could in order to

8    find some opportunity, and she found it at a real estate firm,

9    and she started working there in earnest.

10         At this point, your Honor, she was little more than a

11   child, 19 years' old, moving out to California, and she felt as

12   though she was going to find a place where her qualities were

13   valued and her work was measured and measurable and led to

14   opportunities, she certainly was mistaken or at least

15   short-sighted because the small town, middle-class girl was

16   really entering a world that she never imagined, a world in its

17   harshest terms was brutally abusive on its best days, was

18   fawningly treacherous, where at times Molly's back was

19   literally against the wall with a pack of wolves facing her.

20         Of course, Molly being who Molly is thought I can do

21   this if I am tough enough, I can beat it.  Of course, at some

22   point being tough enough was all that seemed to matter.

23         I've spent, your Honor, much time talking to Molly

24   about the choices that she has made and about the path that

25   started back there in California that led her in a winding way

E52JBLOS                          Sentence

to New York and then to an illegal poker game in New York.  The

sentiment that Molly ultimately comes down to every single time

is I wish I could go back in time to talk to that girl and to

talk some sense into her.

As your Honor is aware, one of Molly's bosses decided

as part of her job responsibilities at her real estate firm, it

would be a great idea for Molly to run a poker game, legal

poker game running out of the Viper Room in Los Angeles.  For

the next several years Molly spent much of her time split, the

first couple of years spending time between her daily work at

the real estate firm where she rose to office manager and

nighttime work where she was expected to go and work these

poker games, and over time the balance of time shifted from the

real estate firm to the poker world.

In the poker world I think the government will agree

with me that Molly spent her time largely running errands for

and catering to very spoiled, very rich, egocentric men who

cared less about the content of Molly's character than her

other attributes, so to speak, and eventually she ran that

game, but it was Molly's desire, because she believed that game

was legal -- and our review of California law helps us conclude

it was a legal game because there was no ring, but it was

Molly's hope to find legitimacy and to find entrepreneurial

success in that environment.

To be clear, your Honor, if -- and I know you need to

E52JBLOS                         Sentence

know who she is as a person to form the basis for sentencing --

if Molly's desire for wealth and fame and recognition ever

outstripped her character in those days, I can assure you, your

Honor, there were plenty of vices that Molly could have

pedaled, plenty of criminal activity around the periphery that

she could have gotten around in and she didn't.  She refused.

She was given opportunity after opportunity after opportunity,

and she said no.

        Moreover, when the players sometimes tried to enlist

staff members in acts that were either illegal or at least

unseemly and rude, lurid, Molly wouldn't let it happen.  She

conducted herself in that world with great professionalism.  By

all accounts, she was an amazing boss who did not mind pushing

back on bratty players, and she catered to the players' wishes

within very defined ethical limits.

        But, your Honor, and I was alluding to this in my

earlier remarks, make no mistake about it, despite Molly's

willingness to push back against unfairness at times, the

players were the owners and operators of these games.  There is

no question about that.  I don't think the government disagrees

with that with respect to the New York game and it certainly

was equally true with respect to the California game.

        Molly was hired as an at-will employee, and despite

the misimpressions that stir in the media, these were not

Molly's games.  The California game had a boss, and that boss

was the leading player.  Although I understand I am here

representing someone who is accused of a crime, I don't mind

saying, your Honor, from every account I have heard, this

individual was a terrible person, a pampered celebrity with an

outsized ego and healthy lust for money.  He selected sucker

players so he could make more.  He charged a tax on the game

for the privilege of using his fan's shuffling machine.

He staked other players and took a percentage of their

winnings.  He resolved disputes among players and among players

and him by making sure that he came out on top.  He had a piece

of a sports betting book on the side and he was also ultimately

responsible for forcing Molly out of the game.

So Molly was not in charge.  The rule was no different

with respect to the game that Molly joined in New York.  The

leading player was the boss of the game.  He was the head of a

very profitable and well known hedge fund, and he recruited

Molly, made Molly audition for the job, ultimately hired her on

an at-will basis, told her the dos and don'ts of the game, and

then ultimately when it served his purposes, was responsible

for making sure she was sacked.  Molly was not in control of

the game.

The point here, your Honor, is Molly, rightly or

wrongly -- certainly there are businesses that are legitimate

and there are businesses that are legitimate but edgy.  From

Molly's perspective in this period of time, she is asked to go

to organized charity events, one whom was for Governor

Schwarzenegger.  There is the World Series of Poker.  There is

an aspect particularly in California of the poker world that is

pure entertainment and it is purely legitimate.  From her

perspective, if she couldn't succeed in the real estate

business and couldn't find her way in other places, she wanted

to succeed in these businesses.

          But the brutal truth of it, your Honor, if we are to

be as candid as possible, is that over the course of time this

business wore on Molly because although she wanted to find

legitimacy and success, at the end of the day in any one of

these circumstances, she ultimately became a throw away

showcase, a very professional and effective one, but a

showpiece nonetheless.

          She endured it and endured the many humiliations she

had to endure to serve all these people, the way many would

have to because she was hoping for real opportunity, for one of

these very powerful captains of industry to sweep her up and

say you have the skills to come into my business and run our HR

or run our investor relations.  She had the realization over

time, particularly when she came to New York, that that was not

happening and that was never going to happen wore on her and

wore her down.

          Let me conclude my remarks on her as a person, your

Honor, with just two short stories that I think tell you that

E52JBLOS                    Sentence

no matter what mistakes she made, she remained a fundamentally

good person.

THE COURT:  That is fine.  I don't mean to interrupt

your flow, but keep in mind I have read all of your materials,

including all of the letters submitted on her behalf, and a lot

of what you have said is in there and I am already familiar

with.  Mindful of that, you may proceed.

MR. WALDEN:  I want to be responsive to your -- I

don't think I have very much more to say, but I will try to

wrap up as efficiently as I can.

I think that this was covered in very brief detail,

your Honor, but I want to make sure you have the flavor of

this.  As we have said in our sentencing submission, there was

a rake imposed.  The rake was imposed by Eddy Ting, a natural

law-breaker.  Someone who is either a law-breaker or someone

who didn't care about the law would have been unfazed by that

decision.  Ms. Bloom became concerned and she actually checked

with an attorney.

The reason I mention this, your Honor, is because from

my perspective, it was a missed opportunity because while Ms.

Bloom beats herself up for not having listened to the

attorney's advice, as I hear the words that he said to her,

assuming you agree with the government and us that when she

found out it was a federal issue, she left for good.  The

attorney told her don't worry, it is just a misdemeanor.  That

1   was obviously inaccurate and incorrect.

2           I can't help but feel as her lawyer that if she had

3   been given the correct legal advice back then, we may not be

4   here.  My point is that she did check, your Honor, and I think

5   that distinguishes her.

6           The second part, your Honor, is once Ting came in and

7   started inviting unsavory people to the games, Ms. Bloom

8   started being threatened, and I think the government agrees,

9   and knows who the individuals were that were threatening her.

10  She was threatened not once, but several times and she believed

11  the people that were threatening her were also extorting or

12  trying to extort the nicer players in the game, and there

13  certainly were some.

14          Ms. Bloom was offered the opportunity from some of the

15  people around the game to serve as her protector, and Ms. Bloom

16  made the decision at that point if she enlisted their services

17  or agreed to them, that:  One, there would likely be escalating

18  violence; and, two, it would ultimately leave her compromised

19  to these protectors who might ask her to compromise her core

20  values.  While a weaker person might have tried to find a

21  solution to use their help, Ms. Bloom did not and faced the

22  consequences herself because she would have rather been at risk

23  herself than create a worse situation where she was potentially

24  putting other people at risk.

25          In terms of the offense conduct, I will be brief

because Mr. Naftalis has already summarized the gravamen of

this offense, but I do want to thank you, your Honor, because

in a real way I think that when the government indicted the

case, they may not have had all of the facts that we were able

to provide to them, and many prosecutors would have had hard

hearts and closed minds, and Mr. Naftalis and Mr. Fischman did

not.  They listened to us, and we are very grateful for that,

and not every prosecutor would.  The gravamen of Ms. Bloom's

conduct stems not from the California case, not even just from

the New York case, but from her decision to stay with the game

in mid-2009 when Ting imposed the rake.

          Ting's reason I think he stated in his sentencing

submission was because he felt that the rake was too generous

and left him exposed to the kind of financial risk that Ms.

Bloom was willing to incur and did incur during the time that

she was running the game.

          We agree with the government when she learned of the

federal investigation in March of 2011, she left even her

attempt to develop any smaller games at all.  She left poker

for good, and I think your Honor's aware if this case were

prosecuted in state court, it would be a misdemeanor.

          There has been much made by other defendants at

sentencing about the timing of their guilty pleas and they were

the first or second to plead out.  I think Mr. Naftalis will

remember that although Ms. Bloom was arraigned on the 18th of

E52JBLOS                    Sentence

April, we actually contacted him on March 8th in order to start

the process for Ms. Bloom to plead guilty.  It was a longer

process than I think either of us wanted because of the factual

information that we needed to provide.

          THE COURT:  Much before March?

          MR. WALDEN:  I meant May.  I misspoke.  May 8th.  She

was arraigned here on April 18th.

          THE COURT:  I think 19th.

          MR. WALDEN:  19th, and on May 8th we contacted the

government for the first time to set up the first substantive

meeting.  It was never Ms. Bloom's intention to take this to

trial.  It was never Ms. Bloom's intention to put the

government to its proof because at the end of the day there is

a part of Ms. Bloom that was relieved this happened because

when she left in mid-March of 2011, she didn't think she was

running away from her troubles.

          She felt he was rebuilding her life and she knew

despite the fact initially she was thrust into a legal poker

game, and despite the fact she was trying to rebuild her life

and dealing with her emotional problems constructively, that

this day might come.  To her great credit -- and you will hear

this from Ms. Bloom directly -- she doesn't bemoan her

situation, doesn't blame anyone, and after the appearance in

this Court, your Honor, believe me when I say 20-20, ABC News,

everyone wanted her to be interviewed, and she only cared from

E52JBLOS                          Sentence

1   that moment until this about two audiences:  You and the

2   government.

3          She did not want to make a bigger circus out of this.

4   She knew it wasn't true and the government wasn't saying that.

5   The media said that she was connected to Russian organized

6   crime.  That perspective, those reports, wrong as they are,

7   will follow her for the rest of her life.

8          THE COURT:  Let me interrupt and ask you to address

9   one thing in that regard because her book, because her book is

10  not being written for me and I don't think it is being written

11  for the government, but it is being written to be sold, and

12  according to the presentence report, she is receiving not a

13  enormous, but a sizeable advance later this year.

14         Number one, I pondered adjourning this sentencing

15  until after the book came out so I could actually see what was

16  in the book.  My concern is that the remorse I am hearing and I

17  am seeing in the letter, letters and the like, I am concerned

18  whether that will be reflected in the book, and I don't know if

19  you have seen it or read the manuscript, but I imagine you

20  have.

21         Second, it belies the claim that the only audiences

22  she cared about are me and the government and in particular

23  also suggests to some extent she is seeking to profit from I

24  think at least in part the notoriety of this case because I

25  think this case in and of itself has increased her notoriety.

E52JBLOS                          Sentence

What do you say to that, I would say, in two respects:

One, am I going to read anything in that book, assuming I read it at all, that is inconsistent with what I am hearing today and read in the sentencing submissions that you filed;

Number two, what bearing, if any, does it have on, for example, a financial penalty, a fine, because Probation recommends no fine.  You ask for a fine no greater than $1,000, but query whether I should impose a fine such that she is not benefiting quite as much from the notoriety that comes from this case.

MR. WALDEN:  So those are all fair questions, your Honor, and let me address them directly.

I think, your Honor, what I say right now I think that you can verify -- the government probably has -- her intention to write a memoir about her time in this world, first of all, your Honor, to be clear is more a precautionary tale than anything else.  Certainly there are details in there that are interesting, fascinating details, but this is the journey of a young woman from a small town that was thrown into this strange and bizarre world.

In a very real way, there was a discussion at one of the sentencings -- I apologize for forgetting which one it was -- but one of the defense lawyers made a claim that gambling in general, I don't think poker specifically, but

E52JBLOS                          Sentence

1    gambling in general is a victimless crime.

2              Your Honor, I do not think that that is Ms. Bloom's

3    perspective.  I think Ms. Bloom has seen in a very, very real

4    way the underbelly of what happens in these secret rooms

5    whether or not the games themselves are lawful or not.  I and

6    the the government will agree during the overwhelming majority

7    of Ms. Bloom's time, because most of her time was spent in

8    California, the games were legal.  There is a real substantial

9    question about whether or not the New York game is illegal,

10   other than the few months --

11             THE COURT:  Slow down so he can keep up.

12             MR. WALDEN:  So, your Honor:

13             A.  Cautionary tale;

14             B.  Her drafting of that book predated her arrest in

15   this case.  The truth of the matter is that she is hugely in

16   debt.  She still owes a debt to the government.  She owes a

17   debt to her mother.  She could not find -- she is working for

18   $19.00 an hour right now in her friend's business to try to

19   make ends meet so that she has some money to afford any sort of

20   accommodations.

21             She is staying with a friend of hers.  She doesn't

22   have her own apartment right now.  So this is not a person who

23   is not, again unlike her co-defendants, she is not a person of

24   entitlement.  She is grateful for any opportunity she gets and

25   she made a decision that despite the fact before she knew this

1    arrest was coming, and before she, before she knew that there

2    would be any notoriety from this case, that she was going to do

3    this as a means to an end and then in this process hopefully

4    start the family that she has always wanted.

5            The third thing, your Honor, is saying that she is

6    profiting from the notoriety of this case, I blame myself for

7    you saying that because I obviously did not convey as clearly

8    as I should have, should or could how humiliating this was for

9    her.  Other defendants have blamed the government.  I don't

10   blame the government one bit and neither does Ms. Bloom.  What

11   they did was appropriate.  It was appropriate for her to

12   account for what she did.

13           The fact that the rake period was unlimited or wasn't

14   her idea is not something that she is standing behind saying I

15   shouldn't be held accountable or it was wrong for the

16   government to arrest me.

17           She was placed by the larger tabloid press as the

18   poker princess, not a moniker she is very proud of, not a

19   moniker she chooses to define herself going forward, and

20   moreover, of all the defendants in this case, your Honor,

21   you're very experienced and I think at bottom the worst fact

22   for her is that the players made her against her will collect

23   money from the losing players, and it was bad for her and

24   certainly not a sign of her culpability because she didn't want

25   to do it, and ultimately she is tagged with a million dollars

E52JBLOS                        Sentence

1    from the rake when, in point of fact, she had to go out of

2    pocket again and again and again during the period of time

3    leading up to the rake, so that she was deeply in debt for

4    debts that she had paid on behalf of other players.

5            She reported it because she is a fair person, and even

6    during the period of time before the rake, your Honor, she

7    actually started an entertainment company and had the

8    entertainment company declare every single penny she was

9    getting from gratuities that there was no record of.  The idea

10   that this case, that she wants to profit from the notoriety of

11   this case is my failing because whatever notoriety there is

12   from this case is certainly not channeled in her memoir.

13           In her view, it is an unfortunate step backwards in

14   her attempt to help other people learn from the odd journey she

15   has been down that ultimately put her at the precipe of doing

16   something she never thought she would be doing, which was to

17   become what she thought was a misdemeanor, and in that process

18   become a felon.

19           The fact you factor that in, you don't factor that in

20   at all.  I have reviewed not in great detail, but I have

21   reviewed the initial draft of the manuscript, and I don't think

22   there is anything I am saying here that is going to be

23   inconsistent with that.  I certainly have my own perspective on

24   what led Ms. Bloom to this case.  I don't remember how much of

25   that is channeled in the book, the emotional difficulty that

1    she went through as a child, which I can understand.  The rest

2    of it is true to what you're going to see in the book.

3              THE COURT:  Why don't you bring things to a close.

4              MR. WALDEN:  Of course, your Honor.

5         Your Honor, the last thing that I want to say is you

6    obviously understand -- and again I was going to get here --

7    the case has destroyed whatever reputation she had, which is

8    fine.  That is what it is.  Her money is going.  She is deeply

9    in debt, in debt not just for her legal bill, but for all the

10   bills she had amassed before she came here, and many of her

11   friends have left her.

12        Your Honor needs to obviously try to place her in some

13   kind of context.  The only defendant that you've sentenced so

14   far that was only involved in the poker business was William

15   Barbalat.  The government agrees Barbalat was more culpable

16   than Ms. Bloom.  He was involved for a longer period of time

17   and he made more money.  Parenthetically, he was one of the

18   worst defendants in the case who received a 36-month sentence

19   in prison.  He consistently --

20             THE COURT:  18.

21             MR. WALDEN:  I am sorry?  I thought it was 36.  I

22   apologize.  I don't know why I dealt with it.  I am sure Mr.

23   Azen is glad it is 18 instead of 36.

24        Barbalat also agreed to split the profits of players

25   that he staked.  He tested positive for cocaine and marijuana

1   while on pretrial release.

2          Ms. Bloom's pretrial supervision has been stellar.

3   She has a terrific relationship with her pretrial relations

4   officer and has had no incidents.  Mr. Barbalat, despite the

5   fact he is more culpable and the extenuating circumstances were

6   worse for him, got two years probation.

7          On the other hand, David Aaron, on the book-making

8   side, like Molly, was one of the least culpable defendants in

9   the case, but even in a comparison with him, Molly I think

10  deserves more leniency.  He, like Molly, provided supportive

11  services to gambling, but Molly was involved in discrete games

12  that took place a few times each month, whereas Mr. Aaron was

13  involved in gambling operations on a daily basis.

14         The illegal portion of Molly's conduct only occurred

15  over the course of a couple of months, whereas Mr. Aaron was

16  involved for more than two years.  Molly's role was to hire

17  coctail waitresses, book hotel rooms, cater to players' needs,

18  and she was not collecting money obviously during the rake

19  periods, so that was during the other period of time she was

20  even doing that.

21         Mr. Aaron actually placed thousands of bets himself in

22  furtherance of a sprawling bookmaking business.  Mr. Aaron was

23  part of a business that, with or without his knowledge, was

24  involved in pretty serious acts of extortion and intimidation

25  to collect some of their debts, while Ms. Bloom would have

E52JBLOS                    Sentence

rather made good on debts on her own or incurred at least the
risk of violence herself rather than getting involved in that
sort of thing.

          I assume it is for all these reasons that Mr. Aaron
did not receive the benefit of the government's recommendation
of a two-level adjustment for minor role.  He got no role
adjustment at all.  Aaron terminated his criminal conduct only
two months before the indictment in this case, whereas Ms.
Bloom by everyone's account walked away two years and a month
before she was arrested in the case.

          Aaron obviously gave no information to the government
that was helpful, whereas Ms. Bloom, as Mr. Naftalis told you,
at least disclosed information about a corrupt informant
helpful to the FBI.  If your Honor were to pick anyone to
compare, we believe it would be Aaron on every score.  We
believe Ms. Bloom is more deserving of credit.  Mr. Aaron got
one year's probation and no fine.

          I appreciate the court's patience.  I am sorry if I
went on too long.  We ask you, most respectfully, to use your
substantial discretion to give Ms. Bloom the most lenient
sentence you can under the circumstances.

          THE COURT:  All right.  Ms. Bloom, is there anything
you want to say before I impose sentence?

          THE DEFENDANT:  I would, your Honor.  I won't go into
great detail how I got into it and what I became because I

1    think Jim covered that.

2           What I do want to do is just talk about the fact that

3    I made mistakes, and due to those mistakes, the last couple of

4    years have been very challenging, but it has also been a great

5    opportunity for growth and I have learned some really

6    incredible lessons and I have met really aspiring people like

7    my attorneys and the government, and people that I think are

8    really just fighting the good fight and full of integrity, and

9    that is was very antithetical to the world I was in before.

10          I really just never want to be on the other side of

11   that, and when the indictment came down, it wasn't a choice to

12   make, I knew that I had broken the law and I wanted to take

13   full responsibility for it.  I wanted to do so in a timely

14   fashion and face those consequences.

15          When I walked away in 2011, I really threw myself into

16   doing the work that I think is necessary to never be in that

17   situation again and to make a life that has meaning and

18   substance, and I have worked on mending relationships and kind

19   of getting back to the true essence of who I am.

20          So in closing, I want to thank my family and friends

21   for being here.  They mean so much.  They have never given up

22   on me and they have just been really just so incredible to have

23   that kind of support.  I want to say sorry for any pain I've

24   caused, any suffering or embarrassment.

25          I want to thank the government for being fair and

1  actually inspiring, and I want to apologize to you, your Honor,

2  for breaking the law and causing any trouble.  I really am very

3  sorry.  I just would like the opportunity to continue on a path

4  that I'm on which I think is rooted in wanting to do the right

5  thing, and that is all.

6        THE COURT:  All right.  May I ask you, I assume you're

7  more familiar with your book than Mr. Walden may be?

8        THE DEFENDANT:  Yes.

9        THE COURT:  If I were to read your book in a couple of

10 months, am I going to see anything in it that would trouble me

11 based on what you just said or the letters and other things

12 that I have reviewed and received in this case?

13        THE DEFENDANT:  I believe my book is absolutely

14 congruent with the comments I just made and it definitely does

15 not glorify or glamorize that world and is a bigger-picture

16 look at just kind of getting lost and going in the wrong way

17 and coming back to find the things that really matter, which I

18 am on that path.  That is a long-winded answer.  I don't think

19 you would find anything that would be contrary to the comments

20 I made today.

21        THE COURT:  Okay.  I am glad that is the case.

22        Is there any reason why sentence should not be imposed

23 at this time?

24        MR. NAFTALIS:  No, your Honor.

25        MR. WALDEN:  No, your Honor.

1          THE COURT:  In imposing sentence, I am required to

2    consider the factors set forth in Title 18, United States Code,

3    Section 3553 (a).  These include:

4          First, the nature and circumstances of the offense and

5    the history and characteristics of the defendant;

6          Second, the need for the sentence imposed to advance

7    the purposes of sentencing, including to reflect the

8    seriousness of the offense, to promote respect for the law and

9    to provide just punishment for the offense, to afford adequate

10   deterrence to criminal conduct, to protect the public from

11   further crimes of the defendant, and to provide the defendant

12   with needed education or vocational training, medical care or

13   other correctional treatment in the most effective manner;

14         Third, the kinds of sentences available;

15         Fourth, the guidelines range, which I found to be zero

16   to six months;

17         Fifth, any pertinent policy statement;

18         Sixth, the need to avoid unwarranted sentencing

19   disparities among similarly-situated defendants; and

20         Seventh, the need to provide restitution to any

21   victims of the offense.

22         Ultimately I am required to impose a sentence that is

23   sufficient but no greater than necessary to comply with the

24   purposes of sentencing that I mentioned a moment ago.  I am not

25   a big believer of hiding the ball, so I will say at the outset

1    I certainly think incarceration is far greater than necessary

2    in this case and totally inappropriate.

3            I am troubled by the fact that Ms. Bloom did what she

4    did knowing that it violated the law.  She may not have

5    received the best or perfect advice in the sense of being told

6    that it was only a misdemeanor, but it doesn't change the fact

7    that she knowingly broke the law, and upon learning there is a

8    federal investigation is not quite the same as leaving or not

9    doing it if she knew it was a federal crime.  I think there is

10   a difference between knowing it is a crime and knowing you

11   might be caught for that crime.  It sounds like she certainly

12   did profit and may well profit from the book as well, from her

13   involvement in this, though ultimately it doesn't sound like

14   she profited a whole lot.

15           On the flip side, she obviously merited her minor role

16   adjustment.  That is a reflection of the fact she did

17   ultimately play a minor role.  It may have been a role that the

18   media finds attractive and interesting, but when push comes to

19   shove, it was not a particularly substantial one, and certainly

20   as far as criminal activity goes, not particularly substantial.

21           I think it predated her involvement and post-dated her

22   involvement.  The rake was only of the limited duration and she

23   didn't initiate, it by all accounts, and from everything I have

24   read and heard, you know, I think -- well, in any event, I

25   think this is a more reflection of error in judgment than being

1  lured by what Ms. Bloom's friend described as the intoxicating

2  vortex of big money and power, and I think and I hope, and I

3  hope that if I do read the book, that it is reflected in the

4  book that Ms. Bloom understands that that intoxicating vortex

5  ultimately wasn't worth its salt.

6          So, in any event, I also am struck by Ms. Bloom's

7  acceptance of responsibility and obvious remorse.  I think for

8  all those reasons and others reflected in the letters and

9  sentencing submission, including as well her providing

10 information to the government after her arrest, a lenient

11 sentence here is warranted.  So I will now state the sentence I

12 intend to impose.  Ms. Bloom, would you please rise.

13         Ms. Bloom, the court hereby sentences you to one year

14 of probation, with the special condition of 200 hours of

15 community service.  During your term of probation, you will be

16 subject to the following mandatory conditions:

17         You shall not commit another federal, state or local

18 crime, you shall not unlawfully possess a controlled substance,

19 you shall not possess a firearm or destructive device, you

20 shall refrain from any unlawful use of a controlled substance,

21 and you shall submit to one drug test within 15 days of your

22 release on supervised release and at least two periodic drug

23 tests thereafter as determined by Probation.

24         You shall cooperate in the collection of DNA as

25 directed by Probation.  In addition, the standard conditions of

E52JBLOS                          Sentence

1    probation set forth in Section 5b1.3 (C) of the guidelines

2    shall apply.  You must also meet the following special

3    conditions:

4          First, you must perform 200 hours of community service

5    as approved by the probation officer;

6          Second, you shall participate in a drug treatment

7    program approved by the United States Probation Department,

8    which program may include testing to determine whether you have

9    reverted to using drugs or alcohol.  I authorize the release of

10   available drug treatment evaluations and reports to the

11   substance abuse treatment provider as approved by the Probation

12   Department.

13         You shall be required to contribute to the costs of

14   services rendered, that is, to make a co-payment in an amount

15   determined by Probation based on your ability to pay or the

16   availability of third-party payment.

17         You shall participate in a mental health program

18   approved by the Probation Department.  You shall continue to

19   take any prescribed medications unless otherwise instructed by

20   your health care provider.  You shall contribute to the costs

21   of services rendered not covered by third-party payment if you

22   have the ability to pay.  I authorize the release of available

23   psychological and psychiatric evaluations and reports to your

24   health care provider.

25         You shall provide the probation officer with access to

E52JBLOS                         Sentence

 1   any requested financial information if you have not satisfied

 2   your financial obligations, which I will discuss in a moment.

 3   You shall not incur new credit charges or open additional lines

 4   of credit without the approval of the probation officer unless

 5   you have satisfied your financial obligations.

 6          You are to report to the nearest Probation Office

 7   within 72 hours and you shall be supervised in the district of

 8   your residence.

 9          Now, I am somewhat torn about the idea of a fine

10   because I do think, based on what I have read and reviewed in

11   the presentence report, at present you do not have the ability

12   to pay a fine.  That being said, I think in part because of the

13   prospect of your book and the advance that you are anticipating

14   getting in a few months, I am going to impose a fine, albeit

15   one at the bottom of the range, and require you to pay $1,000

16   in a fine which you may pay at any point during your time of

17   probation, which is to say, you have 12 months in order to pay

18   that, but I do think a fine is warranted.

19          I am also imposing the mandatory special assessment of

20   $100.00, which is due and payable immediately.  I also find,

21   pursuant to the terms of my order entered December 23rd, 2013,

22   that you are to forfeit to the United States $125,000, which

23   represents the proceeds that you obtained directly or

24   indirectly as a result of or used to facilitate your criminal

25   activity.  That obligation shall be joint and several with

1    those of your co-defendants.

2              Does either counsel know of any legal reason why this

3    sentence should not be imposed as stated?

4              MR. NAFTALIS:  No, your Honor.

5              MR. WALDEN:  No, your Honor.

6              THE COURT:  The sentence as stated is imposed.

7              I find that it is sufficient but no greater than

8    necessary to satisfy the sentencing purposes set forth in

9    Section 3553 (a), including the need to promote respect for the

10   law, to provide just punishment for the offense, to afford

11   adequate deterrence and protect the public from further crimes

12   of the defendant, which I hope and assume there will be none.

13             Ms. Bloom, you are obviously a person of great talent

14   and intelligence.  I am sorry you didn't finish college, and I

15   would urge you to consider finishing it now.  More to the

16   point, I hope you learned your lesson from your involvement in

17   the things that landed you here and that when you leave this

18   courtroom, you don't even think about going back to that sort

19   of thing and think about being lured in by the intoxicating

20   vortexes, as your friend put it.  You have a lot to offer, and

21   I hope that you offer those services and talents for good and

22   not for the sorts of things that landed you here.

23             Now, in that regard I do want to just say that if you

24   do end up back in my courtroom for a violation of your

25   probation, and I certainly hope and assume you will not, that

1    having shown you some mercy today, I will not look kindly upon

2    it and you will suffer consequences for it.  So please don't

3    put me in that position.

4          All right.  I think there is one other count that

5    needs to be dismissed.  Is that correct?

6          MR. NAFTALIS:  Yes, your Honor.  I move to dismiss the

7    open count.

8          THE COURT:  That is Count 27 if I am not mistaken.

9    That count is dismissed.  Ms. Bloom, to the extent you have not

10   given up your right to appeal through your plea and your

11   agreement with the government in connection with that plea, you

12   have the right to appeal.  If you can't afford the costs of an

13   appeal, you may apply for leave to appeal in forma pauperis.

14   Any notice of appeal must be filed within 14 days of entry of

15   the judgment of conviction.

16         Anything else, Mr. Naftalis?

17         MR. NAFTALIS:  No, your Honor.  Thank you.

18         THE COURT:  Mr. Walden?

19         MR. WALDEN:  Two brief things.  You said she had to

20   appear at Probation within 72 hours.  May I ask you if that

21   could be 72 hours after she returns to California, where we

22   anticipate she will be serving her period of probation.

23         THE COURT:  Any objection?

24         MR. NAFTALIS:  No, your Honor.

25         THE COURT:  That is fine.  When is she returning to

E52JBLOS                          Sentence

1   California?

2           MR. WALDEN:  Thursday of next week, your Honor,.

3           THE COURT:  Of next week?

4           MR. WALDEN:  Thursday of next week.

5           THE COURT:  So why don't I give her two days from

6   today to appear at Probation.

7           MR. WALDEN:  The second thing we can submit by written

8   order.  She would like to have her passport returned, if your

9   Honor can order that?

10          THE COURT:  Submit a letter, which I am happy to so

11  order.  I assume there is no objection?

12          MR. NAFTALIS:  No objection.

13          THE COURT:  That seems like the easiest way to do it.

14          Ms. Bloom, I wish you luck.  We are adjourned.  Thank

15  you.

16          (Court adjourned)

17

18

19

20

21

22

23

24

25